IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |  |
|---|---|---|
| **RITA CROCKETT** | ) | |
| | ) | |
| Plaintiff, | ) | **Case No: 1:25-cv-20763-JB** |
| | ) | |
| vs. | ) | **FIRST AMENDED COMPLAINT** |
| | ) | |
| **FLORIDA INTERNATIONAL** | ) | **(Violations of Title VII and Title IX)** |
| **UNIVERSITY BOARD OF** | ) | |
| **TRUSTEES**, | ) | **Jury Trial Requested** |
| | ) | |
| Defendant. | ) | |

_____

**COMES NOW** the Plaintiff, Rita Crockett, by and through her attorneys, and for her causes of action, hereby states the following:

**INTRODUCTION AND SUMMARY OF CLAIMS**

1.  Plaintiff Rita Crockett ("Ms. Crockett" or "Coach Crockett") brings this action against the Defendant Florida International University Board of Trustees ("Florida International University" or "FIU") for pay discrimination, a hostile work environment, gender discrimination, race discrimination, causing damages resulting from the loss of her job and college coaching career in violation of her rights under state and federal law.

2.  This is an action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. (hereinafter "Title VII"), and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq. (hereinafter "Title IX").

3.  Crockett brings this action alleging that Defendant Florida International University discriminated against her in violation of Title VII and Title IX by: (1) terminating her

1

from her position as Head Women's Beach Volleyball Coach without good cause; (2) holding her to a higher standard than male coaches and scrutinizing her differently than male coaches; (3) creating a hostile work environment; (4) retaliating against her for making good-faith complaints of discrimination; and (5) maintaining an employment practice of limiting and segregating women from coaching opportunities for men's athletic teams in violation of 42 U.S.C. § 2000e-2(a)(2).

4.     Plaintiff alleges that Florida International University engaged in pay discrimination.  Coach Crockett was required to do more work for the same or less money paid to male and white coaches when she was required to serve in the roles of Head Coach for Beach Volleyball, Head Coach for Indoor Volleyball, *and* Assistant Athletic Director. Other men and white coaches who only coached one sport were paid significantly more Coach Crockett who effectively had three jobs.

5.     Coach Crockett was forced to work under the added pressure and double standards generated by commonly held gender stereotypes in the student-athletes. These stereotypes added additional "work" to Coach Crockett's job in the form of differential expectations, added pressure, and invalid complaints about the efforts and ability of Coach Crockett to manage her program. In addition, Coach Crockett faced the added burdens imposed by the stereotypes in those working in the athletic administration at Florida International University: stereotypes that created additional expectations on female coaches and that caused the administration to respond differently to complaints made by a female team than to complaints made by male teams; stereotypes that placed expectations on a female coach to manage the emotions and perceptions of her team. Coach Crockett was, because of the effects of

2

stereotyping, required to do more "work" than males because of her gender and/or the gender of her team.

6.      Coach Crockett was subjected to a hostile work environment caused by altered working conditions brought about by the extra work, pressure, and double standards placed on Plaintiff because of unmanaged gender stereotypes resulting from Florida International University's participating in the industry-wide practice of illegal gender segregation.

7.      For all claims—Title VII and Title IX, hostile environment, wrongful discharge— Coach Crockett challenges decisions as motivated by her gender, via negligence, as resulting from a policy or practice resulting in disparate impact and forming part of a pattern and practice of discrimination.  For each cause of action Coach Crockett brings claims for herself as an individual, but also for other women similarly impacted by the negative effects of segregation and stereotypes.

8.      **Plaintiff brings this claim to challenge Florida International University's participation in the nationwide practice that burdens women in athletics with the effects of stereotypes. Plaintiff seeks an injunction that orders Florida International University to change its training, recruiting, and hiring practices to be the first in the domino-falling process required to eliminate the last bastion of illegal segregation in the United States.**

9.      **Defendant maintains an employment system that limits female coaches, including Plaintiff, to coaching only women's teams, thereby depriving Plaintiff and other female coaches of employment opportunities in violation of 42 U.S.C. § 2000e-2(a)(2).**

3

**Illegal Segregation as Per Se Evidence of Stereotypes and Negligence**

10.     College athletics, unlike any other industry in the United States, remains illegally segregated. Female employees (coaches) are *segregated* in the sense they are effectively prohibited from coaching men and are *limited* to coaching only a certain percentage of other women. Men are permitted to coach all other men and fully embraced in coaching women.

11.     Only allowing female coaches to coach women and/or the limitation on the number of female head coaches in women's athletics is a form of illegal segregation, in violation of 42 U.S.C § 2000e-2(a)(2).

12.     The segregation (which Plaintiff challenges as a violation of federal and state law) is the formerly *de jure* and currently *de facto* segregation of female *coaches* from male coaches.

13.     *De jure* segregation occurs when a university openly acknowledges that women cannot or may not be able to coach men.  Such beliefs result from the commonly held gender stereotype that men are better coaches generally or that male athletes would not listen to or respect a female coach. Colleges and universities engaged in *de jure* segregation up to and for some period of time after the passage of Title IX.

14.     *De facto* segregation occurs when a university, through its standard operations or practices, permits, enables, or enforces illegal segregation. Florida International University engages in such *de facto* segregation as set forth in this Complaint.

15.     In Florida, as evidenced by data collected under the Equity in Athletics Disclosure Act ("EADA"), every university making up the State University System of Florida engages in this *de facto* segregation.[1]

16.     EADA data show that at the Florida Agricultural and Mechanical University, there are ZERO female coaches coaching men's teams out of a total of six available positions, yet four male coaches coach women's teams out of a total of eight. Furthermore, there are three female assistant coaches of men's teams out of twenty-eight available jobs, while there are fifteen male assistant coaches of women's teams out of a total of twenty.

17.     EADA data show that at the Florida Atlantic University, there is one female coach coaching men's teams out of a total of eight available positions, yet four male coaches coach women's teams out of a total of nine. Furthermore, there is only one female assistant coaches of men's teams out of twenty-five available jobs, while there are nine male assistant coaches of women's teams out of a total of twenty.

18.     EADA data show that at the Florida Gulf Coast University, there is one female coach coaching men's teams out of a total of six available positions, yet seven male coaches coach women's teams out of a total of nine. Furthermore, there are ZERO female assistant

---

[1]The following EADA data is offered not as the basis for a pattern-or-practice claim, but rather as circumstantial evidence of Defendant's discriminatory intent. This Court may take judicial notice of these federally-mandated statistics as evidence that FIU's hiring practices reflect intentional discrimination rather than neutral decision-making. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 n.20 (1977) (statistical evidence may be highly relevant to proving intentional discrimination in individual cases).

coaches of men's teams out of ten available jobs, while there are four male assistant coaches of women's teams out of a total of fifteen.

19.     EADA data show that at the University of Florida State University, there are ZERO female coaches coaching men's teams out of a total of eight available positions, yet five male coaches coach women's teams out of a total of ten. Furthermore, there are only two female assistant coaches of men's teams out of thirty-two available jobs, while there are eighteen male assistant coaches of women's teams out of a total of twenty-five.

20.     EADA data show that at the University of Central Florida, there are ZERO female coaches coaching men's teams out of a total of six available positions, yet two male coaches coach women's teams out of a total of eight. Furthermore, there are ZERO female assistant coaches of men's teams out of nineteen available jobs, while there are nine male assistant coaches of women's teams out of a total of seventeen.

21.     EADA data show that at the University of Florida, there are ZERO female coaches coaching men's teams out of a total of seven available positions, yet four male coaches coach women's teams out of a total of ten. Furthermore, there are six female assistant coaches of men's teams out of thirty-eight available jobs, while there are twenty-three male assistant coaches of women's teams out of a total of thirty-seven.

22.     EADA data show that at the University of North Florida, there are ZERO female coaches coaching men's teams out of a total of six available positions, yet six male coaches coach women's teams out of a total of nine. Furthermore, there are two female assistant coaches of men's teams out of sixteen available jobs, while there are seven male assistant coaches of women's teams out of a total of twenty-one.

23.     EADA data show that at the University of South Florida, there are ZERO female coaches coaching men's teams out of a total of seven available positions, yet three male coaches coach women's teams out of a total of 8. Furthermore, there are two female assistant coaches of men's teams out of twenty-seven available jobs, while there are eleven male assistant coaches of women's teams out of a total of twenty-one.

24.     EADA data show that at the University of West Florida, there are ZERO female coaches coaching men's teams out of a total of seven available positions, yet four male coaches coach women's teams out of a total of eight. Furthermore, there are ZERO female assistant coaches of men's teams out of twenty-two available jobs, while there are eight male assistant coaches of women's teams out of a total of thirteen.

25.     Florida International University does not buck this disturbing trend. EADA data show that at FIU, there are ZERO female coaches coaching men's teams. Men, on the other hand, are fully supported in coaching women: There are five male coaches of women's teams. The same pattern emerges amongst assistant coaches: There are ZERO female coaches coaching a men's team, while there are a whopping thirteen men serving as assistants on women's teams. The statistics render the *de facto* segregation apparent.

26.     Segregation in college athletics is reminiscent of other historical injustices. The *de facto* segregation of Black people in the United States long after segregation became illegal caused similar levels of harm and legitimized and entrenched false stereotypes about Black people. Racial segregation is referenced as it is the only example of a form of segregation of sufficient power to explain the circumstances surrounding the creation of segregated systems, the continued power of stereotypes to cause harm to the segregated group, and how some of the

7

systemic mechanisms that act to maintain *de facto* segregation came about long after legally sanctioned (*de jure*) segregation became illegal.

27.     Just as in athletics today, during the time of *de jure* and later the continued *de facto* segregation of Black Americans, thousands of organizations permitted and enforced policies and practices that legitimized and entrenched segregation. Consequently, the segregated group (Black people) was prohibited from working in positions traditionally held by the group enforcing segregation (whites). This included a host of jobs (professional, political, and other leadership roles). Just as in our racially troubled past, today, the effects of *de jure* and later *de facto* segregation in athletics legitimize false and harmful stereotypes about women that prevent women from being hired to coach men. That arbitrary limit leads to a corresponding limit on how many women are hired to coach other women and places added burdens (extra work) on women acting the role of head coach.

28.     Today, *de facto* gender segregation exists in every university in the United States. Its continued enforcement is the result of the failure to recruit, consider, or encourage the hiring of females for head and assistant coaching positions for male programs, as well as the result of actively recruiting and hiring men to coach women at equal or higher rates as their female coach counterparts, resulting in a corresponding limitation on women coaching women: less than 45% of women's athletic teams are coached by women.

> Statistics from the NCAA (2004) and from the Acosta and Carpenter longitudinal study (2006) show no change over the last several decades in the percentage of women coaching men's collegiate sport teams (2-3%). Data also shows that less than 43% of women's teams are coached by women and over 57% are coached by males.

Acosta/Carpenter, *Women in Intercollegiate Sport: A Longitudinal, National Study, Thirty Seven Year Update*, (2014).

8

29.     Statistics demonstrating that few women are permitted to coach men and the limitation on women coaching women have remained unchanged for the last 30 years. The percentage of women coaching other women has been locked at under 45% since at least 1994. That figure remains largely unchanged in 2024.

30.     Women are only permitted to coach men in very limited circumstances, most often as part of a dual program where men's and women's programs are combined under one coach, as part of a much smaller school, or occasionally as a public experiment.  No university in the United States, including Florida International University, has taken substantive, affirmative steps to recruit or hire females to coach men in a manner equivalent to the way men are fully encouraged to coach both men and women.

31.     Universities, including Defendant Florida International University, provide men with equal (and often greater) opportunities (recruiting and hiring) to coach women and exclusive opportunities to coach men. Every university embraces or enforces this illegal segregation by silent acceptance or by its own common hiring practices. Every university also enforces illegal segregation and limitations on women's coaching by participating in or silently accepting gender stereotyping.

32.     As explained in this Complaint, the exclusion of women from coaching men and the limitation on women coaching women continues to be enforced via several overlapping forces, outlined as follows:

- First, segregation in athletics was created by and now perpetuates stereotypes that women are not as effective at coaching as men. Segregation can only continue (remain enforced) if a hefty portion of the populus holds a common belief in the same harmful stereotypes that created the segregation in the first place. These stereotypes (that men are stronger leaders/coaches, that women must exhibit feminine traits to be liked etc.) exist in the majority of society and are particularly

9

impactful in college and professional sports, which have traditionally been a very male-oriented field.

- Second, segregation maintains itself partially by means of the harmful impact segregation has on the segregated group. Women considering the profession of coaching can easily observe that they are not permitted to coach men and limited to coaching less than 45% of women. This negatively impacts women's interest in pursuing coaching positions, as well as their ability to have long-lasting coaching careers. Women, like men, are socialized with an implicit understanding that they will not be considered able to coach by the team, by administration, and by the fan base. Women will not even apply for positions to coach men because they tacitly and subconsciously understand how deeply this stereotype is systemically entrenched.[2]

- Third, the effects of stereotypes harm women who are fortunate enough to get through all of the initial barriers of segregation and get hired as head coaches. As this complaint shows, women like Coach Crockett are required to do more work to manage and offset the effects of stereotype-driven double standards, for far less money. Also, as with Coach Crockett, over the last twenty years the effects of unmanaged stereotypes harbored by athletes, parents, and administration have accelerated. Women receive a far greater number of unsubstantiated complaints and are often fired for them, despite the fact that they are doing extra work to try and stop these complaints and have engaged in no improper coaching methods that would justify these complaints or termination as a result of these complaints, especially when compared to her male counterparts, who often use more "aggressive" or "authoritarian" coaching styles, often while getting fewer complaints from athletes and almost always while getting support from university administrations.

- Finally, once a woman is fired from her coaching position for some type of alleged wrongdoing, no other university will touch them. This cyclical process of simply

---

[2] The impact of internalized and socialized segregation was thoroughly investigated in *Brown v. Board's* famous doll test. In those experiments, a majority of African American children showed a preference for dolls with white skin over dolls with Black skin. In the experiment, African American children were asked to pick between a doll with white skin and a doll with Black skin when given the following prompts: (i) Which doll do you want to play with? (ii) Which doll looks white? Which looks "Negro?" (iii) Which doll is "good?" Which is "bad?" (iv) Which doll looks most like you?  The children almost uniformly said they wished to play with the white doll and that the white doll was good while the Black doll was bad. When the children were asked which doll looked most like them, many broke down into tears. The results were a harrowing testament to the deleterious effects of racial segregation. Erin Blakemore, *How Dolls Helped Win Brown v. Board of Education*, HISTORY CHANNEL (Sept. 29, 2023) (available at https://www.history.com/news/brown-v-board-of-education-doll-experiment) (last accessed July 29, 2024).

treading water, trying to bridge the gap between "feminine" and "masculine" coaching styles to address baseless complaints, limits the number of women interested in being hired to coach women and excludes them from coaching men. It places added work and increased burn-out on those women who are able to retain their head coaching position. It creates a high risk of being forced out because of stereotype-driven complaints. It then precludes a woman who has been forced out or fired from being rehired, thereby opening up her position for either a female who will be subjected to the same negative forces or a male.

**Florida International University Participates in the Nation-Wide Practice of Illegal Gender Segregation**

33.     Defendant Florida International University has engaged in illegal segregation for many years. As of the date of this Complaint, Florida International University has zero women as head coaches for men's teams.[3]

34.     Conversely, as of the date of this Complaint, five of the nine available head coaches for the women's teams at Florida International University are male.

35.     FIU does not even employ women as assistant coaches of men's teams while recruiting and hiring men to fill 75% of the assistant coaching positions on women's teams.

36.     There is no reason (other than discriminatory attitudes driven by gender stereotyping) for a university to recruit and hire only men to coach men and actively recruit and support men to coach women's teams but deny women the opportunity to coach men and limit their opportunities to coach women.[4]

---

[3] *Equity in Athletics Data Analysis: Florida International University*, UNITED STATES DEPT. OF ED. (Fiscal Year 2023) (available at https://ope.ed.gov/athletics/#/institution/details (search Florida International University and select "Coaching Staff and Salaries" tab)) (last accessed Nov. 21, 2024).

[4] "Based on our results and other findings (e.g., Berri et al. 2009) that have examined the impact of head coaches on teams' and players' performances, it appears that both men and women are readily equipped for success in the coaching profession (and in some cases, women

37.     Gender segregation in college athletics is not "separate but equal," but rather a one-way segregation that gives men exclusive, complete access to coaching men and disproportionately larger access to coaching women when compared to the opportunities given to female coaches seeking to coach men.[5]

38.     Defendant Florida International University's participation in *de facto* segregation against women constitutes a separate claim under 42 U.S.C § 2000e-2(a)(2) and supports a claim for a hostile work environment, regardless of whether the female coach ever applied for a position to coach men.

39.     The fact that Defendant Florida International University permits, enables, or enforces *de facto* segregation is also proof of a hostile work environment and wrongful termination in violation of 42 U.S.C § 2000e-2(a)(1) based on gender stereotyping.

40.     Plaintiff Coach Crockett alleges that Defendant Florida International University engaged in discrimination via stereotyping. The discrimination occurred via the direct

coaches have been more successful than the male coaches they replace; Aicher and Sagas 2010). As such, our results imply that the absence of women coaches for men's teams is not grounded in any objective or reliable evidence." Darvin, L., Pegoraro, A., & Berri, D*., Are Men Better Leaders? An Investigation of Head Coaches' Gender and Individual Players' Performance in Amateur and Professional Women's Basketball*, SEX ROLES, 78:455–66 (2018).

[5] "Imposing sex segregation on sports is problematic for many reasons. Sex segregation reflects and reinforces a binary view of both sex and gender unsupported by science. It communicates that women are physically unable to compete against men, even though research indicates considerable variation among individual athletes and different sports, and further reveals that attributes other than sex are often more important determinants of athletic ability. It reinforces unfounded gender stereotypes that harm both women and men. And sex segregation uncritically prioritizes athletic activities involving strengths typically associated with male bodies, without requiring us to ask why we view these strengths as the most important in the first place." Leong, *Against Women's Sports*, 95 WASH. U. L. REV. 1 (2018).

application of stereotyped evaluations of Plaintiff Coach Crockett as a female coach.  The discrimination also occurred via the Defendant's reliance upon, or the influence of, stereotyped evaluations by athletes and third parties.

41.     Whether the termination of Plaintiff occurred due to gender stereotypes about female coaches or female athletes held by the administration, or due to the administration being influenced by the stereotyped evaluations of third parties or student-athletes, the decision to terminate Coach Crockett was because of sex/gender and violates state and federal law.

42.     The effects of segregation in athletics support a claim of gender discrimination in two primary ways. First, continued illegal segregation supports the **perpetuation of gender stereotypes** in the minds of every person who lives or works in the college sports system.   Just as racial segregation against Black Americans (*de jure* prior to 1959 and *de facto* post 1959) could not remain in place without millions of people holding racial stereotypes, the same is true about gender segregation in athletics today.

43.     The only way that segregation continues is if not one or one hundred, but almost every athlete, parent, and administrator accept that women are segregated from coaching men and limited in coaching other women.  To accept that status quo one must believe in or tacitly accept the gender stereotypes that justify segregation, in the same way we did with Black people.

44.     The reality of continued segregation and the resulting stereotypes provides evidence that **gender motivates athletes' complaints about female coaches and the administration's response to those complaints.**

45.     Second, the effects of segregation create **added work for a female coach** as she must walk the lines required to maintain her coaching position and manage the double standards placed upon her by the pressure of gender stereotypes.

46.     This supports a claim of a hostile work environment for any coach (regardless of whether she applied to coach men) as **her working conditions are irrevocably altered by her status as a member of the segregated group**.

47.     As demonstrated in her Statement of Facts below, Coach Crockett was working daily not only to do her job, but also to manage the socialized and stereotype-driven expectations of her athletes while being undermined by Florida International University administration.  This added work and pressure was directly related to her gender and altered the conditions of her employment. This is especially clear when the expectations placed upon Coach Crockett are compared to the expectations the University placed on a male coach doing the same job.

**<u>Added Stereotype Risks Resulting from Gender Socialization</u>**

48.     Gendered socialization covers many aspects of how we raise children and learn from our environment, but in this context, it refers to the differences in how young men and young women report their emotional responses to perceived risks of emotional or physical harm.

49.     Men and women feel emotion (fear, worry, insecurity, threat) in similar ways, but they are often socialized to express that emotion differently. Young women are socialized to report emotion and risk more openly to each other, to parents, and to other third parties, while young men are socialized to refrain from reporting their emotions or potential risks.

50.     Adults (parents who raise children and members of university administration in the context of sport) are the group who participated in the socialization of young men and women

to respond to and report these risks in different ways. As such, non-student-athlete adults will hold a stereotyped expectation that young females report or respond in a specific way to emotional and physical risk and will also hold a stereotyped expectation that males report or respond differently to exposure to similar emotional and physical risk.

51.     Gender socialization results in a process where young men and women report their concerns differently because they are expected to do so and will, separately, result in a differential response by older adults to those concerns. This often results in non-student adults (parents and administration) feeling less engaged or interested in responding to, or "fixing" the worry, fear, or concern if it is expressed by a young male and being far more engaged and wanting to "fix" the worry, fear, or concern if it is expressed by a young female.  The common response is to put one's arm around a female student-athlete to reassure her, while telling the male to "buck up." This response is part of our socialization of young men and women, and it is a process that continues through young adulthood and certainly through the college years.

52.      Gender socialization is a process that has a particular impact on men and women participating in athletics and today, is a force (separate from the stereotypes about women in coaching) that adds to the burdens on coaches of women's teams compared to men's teams and that places even higher expectations on female coaches of women's teams.

53.     Gender socialization will result in more concerns of emotional or physical risk being raised to administration by female athletes compared to male athletes. That creates a false data set or misperception that a coach of a female team (regardless of coach's gender) is getting more complaints than a coach of a men's team.  Gender socialization also creates pressure to respond differently to concerns raised by male or female athletes.  Administration will respond differently by trying to manage, seeking to fix, or trying to protect the female athlete's feelings

while limiting or responding negatively to concerns raised by males for the same type of behavior.

54. Athletics requires a process that places some level of mental and physical stress on the athlete. This includes the physical stress required to break through barriers that prevent someone from running/swimming faster, jumping higher, lasting longer, or otherwise competing within the physical requirements of the sport when compared to other athletes on the team or competitors. It includes the mental stress required to break through the mental blocks that prevent any human being from doing the work to run faster, jump higher, or last longer while playing a sport. Mental barriers can be as simple as getting out of bed to go work out or practice, to withstanding pain/discomfort while breaking through physical barriers to high performance, or as complex as not giving up at a key moment, staying motivated, or overcoming imposter syndrome when one is about to achieve one's highest goals.

55. As a result of these gendered socialization differences, coaches of female programs receive more student-athlete complaints when compared to coaches of male programs, regardless of whether the coaches are behaving any differently toward the athletes than coaches of male programs.

56. Defendant is fully aware that female teams make more complaints about their coaches than male teams, despite the coaches utilizing the same or similar coaching methodologies.

57. When a report is made about the behavior of a female coach, a university is more likely to fault the female coach than it would be to fault a male coach for engaging in the same behavior.

58.     Because of gender stereotypes and gendered socialization, a university will fault the female coach in several ways:

- The university will fault the female coach for the mere fact that the athletes claim to be harmed or feel negative emotions.

- The university will more quickly, and with less evidence, fault the female coach for any mistake, act of poor judgment, or out-of-context comment.

- The university will place pressure on the coach to "fix" the problem by changing her communication style or coaching methods.

59.     Complaints about Coach Crockett were, at least in part, because of gendered socialization and the differential gendered expectations placed on her as a female coach.

60.     Gender socialization is a fact of life. It is scientifically supported and its impact on our collective evaluations of the role of men and women is unquestionable.  Yet, not a single university, including Florida International University, takes gender differences into account to ensure that male and female coaches are judged fairly, paid equally, and are not held to different standards.

61.     Gender socialization is a form of gender stereotyping.  Gender stereotypes cause young men and women to feel they are expected to report or not report risk and gender stereotypes in administration create differential responses to those reports by males or females, which, in turn, entrenches the socialized expectation that male and female athletes report these risks in different ways.

62.     Gender stereotypes (about women in leadership/coaching and responding to young male and female concerns of risk) are so prevalent that it likely will impact almost every person reading this Complaint.   To offset the negative effects of stereotypes requires placing the role of gender in the context of other forms of discrimination, such as race.

63.     The process of gender socialization would be no different than in the latter days of racial segregation if white and Black students tended to report their coach or professor for different reasons based on how each group was expected to respond based on their race and, separately, how they chose to complain depending on the race of their coach or professor.   It is no different than if members of a university administration (as would have been the case at that time) took the complaints of white students seriously and tried to manage, fix, or protect white students who complained while discouraging or ignoring Black students. In either situation, the complaint process (why students report or fail to report) and the administration's reactions to those complaints (why or how the administration responds to the concerns) is based in whole or in part on the race of the student-athlete.   Any decisions based on race (of the athlete or the coach) would be illegal.

64.     Like today with gender segregation in athletics, the student complaint process and administration response to the complaint process in the example above will ignore whether the complaints of athletes are justified (show a violation of law or university policy). It will also ignore whether white and Black coaches or coaches of white and Black teams are coaching in the same, acceptable manner. The process is driven by race and so it will always focus on the expectations of how each race should complain and the response to those complaints based on racial stereotypes about the athletes and the coaches.

65.     The complaint process will place added pressure on those who coach whites (in this example) while removing pressure from those who coach Black players.   The race of the coach also matters, as whites will tend to report Black coaches more often than white coaches, consistent with stereotyped expectations, which, as mentioned above, require a Black coach to

18

work much harder to "keep the peace." Finally, this process will result in valid concerns of Black student-athletes being ignored.

66.     Today, while racial bias continues to have effects, and while it without doubt played a role into the unequal treatment of Coach Crockett, the undeniable factor in college athletics that creates a differential response between athletes and coaches is gender.   It results in more complaints from a women's team compared to a men's team. It results in more complaints directed toward female coaches than their male counterparts.  It results in universities enabling the unsubstantiated complaints of female athletes, which are more often directed at female coaches more than male ones.  It results in a process that overlooks or ignores the harm inherent in creating a system that has resulted in men coaching the vast majority of men and the majority of women, while female coaches are left to pick up the scraps.  It is a process that is driven by gender stereotypes. For these reasons, we as a society cannot allow these prejudices to inform any part of the decision-making processes regarding employment in athletics. Not only does the current hiring system constitute outright segregation, it also makes more work for female coaches who are fortunate enough to escape the hiring process with a coaching position, often leading to their terminations or resignations.

**Knowledge of Stereotype Risk and Breach of Duty of Care**

67.     The University's obligations under Title VII and Title IX create a duty to take reasonable care to prevent harm from gender stereotypes.

68.     Title VII requires an employer to protect employees from gender-based and race-based discrimination in the terms and conditions of their employment. This includes a duty of care to avoid forms of discrimination that represent a known risk to employees.

19

69. Title IX prohibits gender discrimination in educational institutions that receive federal financial assistance, like Florida International University.

70. Title IX was created specifically to address gender discrimination in college athletics and creates a duty of care, namely care to mitigate or eliminate discriminatory conduct or policies which could lead to gender discrimination in universities generally, and specifically, as here, college athletics. Inherent in this duty is the need for heightened awareness of the risks of gender stereotypes, a duty that extends beyond those required of employers under Title VII.

71. Title IX requires that, once Florida International University or any university becomes aware or should have become aware of a discriminatory practice, that university take action to rectify the discriminatory conduct, pursuant to the duty of reasonable care established by the statute.

72. While there is an obligation to avoid discrimination toward all protected classes, the risk of gender stereotypes is so well known and so acute in the case of college athletics that a duty of care exists to prevent harm from this known risk.

73. Florida International University is aware of its obligations under Title IX, in addition to Title VII. All universities, including Florida International University, provide training on biases and stereotypes.

74. Florida International University has a duty to exercise reasonable care to prevent reliance on stereotypes that negatively impact women in athletics. This duty is the result of: (i) the direct obligation to prevent all forms of discrimination under Title VII and state law; (ii) the added obligation created by Title IX to exercise awareness of the risks of gender discrimination;

and (iii) the general knowledge of the risks of gender stereotyping, as well as the training provided by the University that creates awareness of these risks.

75. Florida International University's participation in the segregation of females from coaching males is evidence of actual knowledge of the risk of stereotypes impacting women and is also *constructive knowledge of this risk as a matter of law*.

76. In this case, Florida International University knew or should have known that student athletes were making unfounded complaints. Florida International University knew that Coach Crockett had done nothing to justify the complaints about her behavior or performance. She had, in fact, led the team to great success over her tenure, up through her last season with the University.

77. Given the University's knowledge of the risks inherent in a gendered, segregated system and the attendant legal duty to avoid those risks, the University had an obligation to exercise due care in its response to the complaints about Coach Crockett raised by the athletes, and any others.

78. Defendant Florida International University failed to exercise reasonable care in collecting the complaints.

79. The Defendant knows that a formal process is necessary to reduce or remove the effects of all forms of bias or stereotyping.  Defendant has such processes in place, but in response to female athletes alleging emotional upset or expressing petty criticisms about a female coach, Florida International University ignored its process and permitted the stereotypes about the coach to run free.

80.     Within the University's formal grievance process (had it followed its internal protocols to collect and evaluate complaints and provided Plaintiff Coach Crockett a chance to respond and defend herself), Florida International University failed to exercise its duty of care to avoid the harmful effects of gender stereotypes in its response to athletes or evaluation of coaches in additional ways.

81.     Florida International University failed to require that athletes and other potential complainants be notified of or trained on the risks of gender stereotyping. Florida International University's process has no accountability measures to reduce the impact of stereotypes and implicit biases.  The process does not require that athletes put their concerns in writing or limit their complaints to information based on personal knowledge. They are permitted to verbally report and/or submit complaints informally via email without then being required to formalize their concerns in writing in a manner to ensure accountability. Memorializing complaints in writing is of paramount importance, as documentation creates an accountable grievance process that makes a donor, parent, or athlete feel responsible for putting specific information or concerns based on their personal knowledge in writing, with the knowledge that the object of the complaint will then be provided an opportunity to respond, in this case the head coach.  Florida International University's grievance process does permit complaints to be transmitted to the head coach or permit her an opportunity to respond, provide context, or defend herself.

**Risks of Gender Stereotypes Affecting Female Coaches**

82.     Female coaches are expected to behave in a manner that is consistent with societal stereotypes about females.

83.     Societal expectations of females include that they identify with the role of family caretaker/nurturer, not the role of a "leader," such as a head coach.

84.     The role of leader, or head coach, was designed and remains defined as a "male-type" task. Coaching behavior is, therefore, supposed to be consistent with expectations of how a male should behave, not a female. The fact that head coaching positions remain associated with male-type tasks or behavior results from gender stereotyping.

85.     These expectations or stereotypes about the roles of females in society create what is called a "lack of fit" or "role incongruity," wherein women holding high-level positions such as administrator or head coach are considered inappropriate for those positions if they fail to exhibit traditionally "masculine" leadership qualities.

86.     This lack of fit leads students, parents, and administrators to evaluate the behavior of female coaches differently than they evaluate the behavior of male coaches. This differential evaluation occurs regardless of whether the team is comprised of male or female athletes.

87.     As a result of stereotypes, a female coach who behaves in a stereotypically feminine manner is faulted for being "too soft" or "effeminate" in their coaching style. A female coach who behaves in the way we expect head coaches to behave (i.e., male-type tasks and behavior) is often faulted for being "too harsh" or "aggressive."

88.     Males are not similarly evaluated based on this double standard.

89.     The double standards, "lack of fit" analysis, and stereotyping often result in a litany of student-athlete complaints being levied against female coaches.

90.     These student-athlete complaints occur even though the female coaches are not coaching any differently, and certainly no more harshly, than similarly situated male coaches. The stereotyped beliefs held by most athletes, parents, and administrators will regularly cause an athlete or parent to misjudge a female's normal coaching methods or behavior as somehow inappropriate or incongruent with the putative complainant's expectations.

91.     Often, a female coach's methods or behavior are misjudged as: (i) intentionally harmful to the athlete when they are neither intentional nor harmful; and/or (ii) not reflecting concern for the athletes' well-being, even when the coach is acting in the team's best interest. These are just a few of the ways that female coaches are often misjudged or negatively evaluated by athletes, parents, and university administration.

92.     A female coach's actions are misinterpreted due to stereotyping, and she is blamed for the feelings of the athletes. Societal and systemic stereotypes cause us to expect female coaches to manage and control the feelings of their athletes: to ensure they are happy, have no hurt feelings, and do not fear emotional or physical harm.  This socialized role of how a woman is supposed to behave when dealing with the emotional or physical fears of young adults is inconsistent with the profession of college coaching, a profession that requires coaches to stress athletes to help them achieve their highest physical and mental performance, not only for the benefit of the team, but also for the benefit and betterment of the individual athlete.

93.     Athletes expect collegiate and professional coaches to be firm, direct, and even authoritarian at times. However, those characteristics are more consistent with the common expectations of how men are supposed to behave, not women.  When a female coach seeks to exhibit behavior that fits with the expected role of a head coach (firm, direct, authoritarian), she will often receive backlash in the form of complaints or negative evaluations.

94.     Coach Crockett was using coaching methods that were no different or more extreme than any other collegiate or professional coach would use. She was not doing anything that any male coach would not do.  She was engaging in no language or actions that any university or professional coaching organization would view as abusive, harmful, or outside the bounds of professional behavior.

95.     There were male coaches at Florida International University who, especially when compared to Coach Crockett, were engaging in coaching that was harmful, disrespectful, and, if not crossing the line, straddling the line between professional and unprofessional coaching methods.

96.     The following male coaches at Florida International University directly benefit from the system of segregation in terms of hiring opportunities, career advancement, and freedom from the double bind that restricts female coaches like Coach Crockett:

97.     **Mike MacIntyre**, Head Coach of Football, enjoys career opportunities entirely foreclosed to female coaches as women are effectively barred from coaching football at any level. During Coach Crockett's tenure, Coach MacIntyre was accused by former players of verbal abuse and physically throwing chairs in the locker room that struck players, as well as throwing players' helmets at practice and making them retrieve them. Despite these allegations—which surfaced publicly in November 2024—Coach MacIntyre faced no disciplinary action for his conduct; instead, he was terminated solely based on his won-loss record after three consecutive 4-8 seasons. This demonstrates how identical behaviors (or worse) are interpreted differently based on coach gender. When a male coach allegedly engages in physically aggressive conduct, he faces no investigation or discipline for conduct; when a female coach like Coach Crockett is

25

accused of far less severe conduct based on student-athlete complaints rooted in gender stereotypes, she is immediately suspended, investigated, and terminated.

98.     **Jeremy Ballard**, Head Coach of Men's Basketball, operates in a sport where female coaches are systematically excluded from men's programs. Coach Ballard commonly uses direct communication styles and demanding performance expectations. Despite compiling a losing career record at FIU (46% winning percentage) and five consecutive losing seasons from 2020-2024, Coach Ballard has been retained. His direct coaching methods—including performance-based criticism and accountability measures—are deemed appropriate "coaching intensity" rather than misconduct. These same methods, when employed by Coach Crockett, were mischaracterized as "toxic" or creating an "abusive" environment.

99.     **Rich Witten**, Head Coach of Baseball, regularly implements consequences for performance issues without those actions being labeled as "targeting" or "creating a toxic environment." His strict disciplinary approach, including demanding expectations of players and direct communication about performance deficiencies, is characterized as "holding players accountable" rather than misconduct—the identical characterization denied to Coach Crockett.

100.     **Randy Horner**, Head Coach of Swimming and Diving (both men's and women's programs), demonstrates the one-way nature of segregation in athletics—men can coach both men's and women's teams, but women are rarely permitted to coach men's teams. As a male coach of both men's and women's teams, Coach Horner maintains consistent coaching standards across both programs without facing gender-based critique. His demanding workouts, direct criticism, and high standards—methods comparable to or exceeding the allegations against Coach Crockett—are characterized as "high standards" rather than misconduct.

101.   **Mike Larabee**, Head Coach of Softball, and **Mike Meyers**, Associate Head Coach of Softball, are male coaches of a women's team—further demonstrating the one-way segregation pattern. Men are hired to coach women at FIU, but women are never hired to coach men. These male coaches of women's teams employ direct coaching methods, implement accountability measures, and maintain high performance expectations without facing the same gender-stereotyped complaints and administrative responses that female coaches of women's teams, like Coach Crockett, experience.

102.   Coach Crockett was negatively impacted by gender stereotypes in the assessment of her behavior, her coaching methods, and her performance. Despite engaging in the same behavior or, more often, less harsh or potentially offensive behavior compared to her male counterparts, she received complaints from athletes.

103.   The key comparison is not that these male coaches engage in inappropriate behavior, but rather that standard coaching practices (clear performance expectations, direct communication, and accountability measures) are interpreted differently when employed by female versus male coaches. When male coaches establish performance consequences or provide direct feedback, these actions are typically viewed through a neutral or positive lens. When Coach Crockett employed the same standard coaching practices, these actions were filtered through gender stereotypes and characterized negatively.

104.   These double standards result in student-athlete complaints about coaches. Both the double-standards and the complaints are the direct result of gender bias. Universities making employment decisions that rely in whole or in part upon student complaints about their coaches which are premised upon bias or stereotypes are liable for gender discrimination under Title IX and Title VII.

105.    Universities also react and respond differently to complaints from female student-athletes when compared to males. For example, university administration will often coddle and appease female student-athletes who complain about their female coach yet ignore or overlook similar complaints from male student-athletes about their male coach.

106.    As a result of this double standard, male athletes who complain about their coaches are at a higher risk, as their complaints are often ignored. Likewise, it places female coaches at risk, as they may receive more student complaints and are held to a higher standard by the administration.

107.    Actions taken by university administration on the basis of this double standard – relying on biased complaints made by student-athletes, treating the complaints of female student-athletes differently than male student-athletes, or holding the female coach to higher standards than male coaches – are all forms of gender discrimination that violate Title VII and Title IX.

108.    A female is expected to behave in a manner that is consistent with societal stereotypes about females. If she behaves in a stereotypically feminine manner, then she is faulted for being "too soft" as a coach. If she adopts a more traditional, "masculine" coaching style, then she is faulted for being "too harsh." This double standard results in backlash from students and parents that often takes the form of student-athlete complaints. These complaints are, in whole or in part, a response to the failure of the female coach to behave in a manner that fits the stereotyped expectations of athletes or parents. A university that relies, in whole or in part, upon complaints generated by bias or stereotypes engages in gender discrimination.

109.    Relying on biases and stereotypes to make an employment decision—for example, relying on biased student-athlete complaints against coaches, treating the complaints

of female athletes differently than those made by male athletes, or holding female coaches to double standards—are forms of gender discrimination that violate federal and state anti-discrimination laws.

### JURISDICTION AND VENUE

110. Jurisdiction and venue exist in this Court, as the events giving rise to this lawsuit occurred at Florida International University in Miami, Florida.

111. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and the Court's pendent claim jurisdiction under 28 U.S.C. § 1367(a).

112. Venue is appropriate in this District under 28 U.S.C. §§ 1391(b) and (c).

113. Coach Crockett's charge of discrimination against Defendant was cross-filed with the EEOC and the Florida Commission on Human Relations (FCHR) on May 16, 2023.

114. The EEOC/FCHR charge alleged, *inter alia*, that Defendant discriminated against Coach Crockett on the basis of sex, race, and terminated her in retaliation for protected complaints.

115. The EEOC issued a Notice of Right to Sue dated November 25, 2024. This action is being timely filed within ninety (90) days of the issuance of the Notice of Right to Sue.

116. As of the date of the filing of this Complaint, more than 180 days have passed from the dual filing of Crockett's charge of discrimination and the FCHR has failed to conciliate or determine whether there is reasonable cause to believe that discriminatory practice has occurred in violation of the Florida Civil Rights Act of 1992. Crockett has therefore exhausted their administrative remedies under the FCRA and is entitled to bring a civil action in this Court pursuant to § 760.11(8).

**PARTIES**

117.    Plaintiff Crockett is a resident of Ft. Lauderdale, Florida.  As a Black female, Crockett is among the persons protected from unlawful discrimination by Title VII, Title IX, and the FCRA.

118.    Defendant Florida International University is an institution of higher education located in Miami, Florida whose athletic teams participate in the NCAA Division I Conference USA.  At all times material, FIU employed more than 15 persons and was therefore an employer as defined by Title VII, Title IX, and the FCRA.

**TITLE IX REGULATIONS**

119.    The Supreme Court of the United States has held that Title IX has an implied private right of action for discrimination and retaliation. *Cannon v. University of Chicago*, 441 U.S. 677, 717 (1979); *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512 (1982); *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 179 (2005).

120.    The Supreme Court of the United States has held that Title IX cases provide for remedies including, but not limited to, monetary damages and equitable relief. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255-56 (2009); *Barnes v. Gorman*, 536 U.S. 181, 187-88 (2002); *Davis v. Monroe County Bd. of Educ.*, 526, U.S. 629, 633 (1999); *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 62–63 (1992).

121.    Florida International University is a "recipient" of federal financial assistance within the meaning of Title IX. 34 C.F.R. § 106.2.

122.    As a recipient of federal financial assistance, Florida International University must agree to comply with Title IX regulations codified at 34 C.F.R. § 106 *et seq*. as a condition precedent to receiving federal financial assistance. 34 C.F.R. § 106.4 ("Assurance required").

30

123.     Florida International University's Title IX obligations include protecting Florida International University students and employees from gender discrimination in education and employment.

124.     The Title IX Education Programs or Activities Regulations prohibit Florida International University from providing any aid, benefit, or service to a student on the basis of sex including but not limited to actions that would:

> . . . .

> (1) Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;

> (2) Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;

> (3) Deny any person any such aid, benefit, or service;

> (4) Subject any person to separate or different rules of behavior, sanctions, or other treatment;

> (5) Apply any rule concerning the domicile or residence of a student or applicant, including eligibility for in-state fees and tuition;

> (6) Aid or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees;

> (7) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

34 CFR § 106.31(b).

125.     The Supreme Court upheld the validity of the employment regulations in *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1982). *See also Brine v. Univ. of Iowa*, 90 F.3d 271,

275-76 (8th Cir. 1996) (looking to 34 C.F.R. § 106.51 regulations to define Title IX claim in conjunction with statute).

126.     The Title IX Employment Regulations found in 34 C.F.R. § 106, Subpart E protect against various forms of employment discrimination, including but not limited to:

> (1) Recruitment, advertising, and the process of application for employment;
>
> (2) Hiring, upgrading, promotion, consideration for and award of tenure, demotion, transfer, layoff, termination, application of nepotism policies, right of return from layoff, and rehiring;
>
> (3) Rates of pay or any other form of compensation, and changes in compensation;
>
> (4) Job assignments, classifications and structure, including position descriptions, lines of progression, and seniority lists;
>
> (5) The terms of any collective bargaining agreement;
>
> (6) Granting and return from leaves of absence, leave for pregnancy, childbirth, false pregnancy, termination of pregnancy, leave for persons of either sex to care for children or dependents, or any other leave;
>
> (7) Fringe benefits available by virtue of employment, whether or not administered by the recipient;
>
> (8) Selection and financial support for training, including apprenticeship, professional meetings, conferences, and other related activities, selection for tuition assistance, selection for sabbaticals and leaves of absence to pursue training;
>
> (9) Employer-sponsored activities, including those that are social or recreational; and
>
> (10) Any other term, condition, or privilege of employment.

34 C.F.R. § 106.51(b).

127.     Florida International University's obligations pursuant to the Title IX regulations also protect its employees from the operation of stereotypes.

**STATEMENT OF FACTS**

128.     Defendant hired Coach Crockett on or about December of 2011 as Head Women's Beach Volleyball Coach.

129.     Coach Crockett built an incredible history in her sport and was coaching for Defendant at a very high level over 12 years.

130.     Coach Crockett was the one of the first African Americans to be on the USA Olympic team in 1994 which was the first USA Women's Volleyball team to medal in the Olympic games.

131.     During her tenure with Defendant, Coach Crockett was the first and only African American DI National Coach of the Year (2015 beach volleyball).

132.     Coach Crockett has coached three national championship appearances with one final-four finish.

133.     Coach Crockett has coached both Beach and Indoor Volleyball, and both teams maintained an excellent academic rating.

134.     Given her resources and her conference, Coach Crockett's on-court and off-court performance was exemplary.

135.     Despite her strong record and performance, Coach Crockett faced push back from her supervisor, Julie Berg-McGraw (white/female), Senior Women Administrator, for years.

136.     Ms. Berg-McGraw:

- •     Micromanaged Plaintiff's coaching efforts;

- •     Told Plaintiff not to recruit Americans because she "did not connect with them;"

- Moved Plaintiff from her corner office, deceitfully telling her Scott Carr, Athletic Director, wanted it, but actually gave it to Christina Robertson, the white coach who replaced Plaintiff as Indoor Volleyball Coach, while Plaintiff was placed in an external trailer;

- Gave Plaintiff low evaluation scores, sometimes going back and changing them when Plaintiff pushed back on the score and Ms. Berg could not justify it (e.g., giving Plaintiff a 3/5 for "Job Knowledge" in October of 2022 following a strong season, then later changing it to a 4/5);

- Skipped over Plaintiff when announcing coaches at an event;

- Hired a white, less-experienced Indoor Volleyball coach over Plaintiff's African American daughter, an FIU grad who had been coaching for years;

- Would not approve Plaintiff's requests for busses while simultaneously approving them for white male coaches; and

- Would pose questions to players insinuating they should talk badly of Plaintiff.

137.    On October 1, 2022, Coach Crockett emailed AD Scott Carr requesting a meeting to discuss her concerns regarding Ms. Berg-McGraw. Plaintiff specifically stated she did not feel she was equally valued and that Ms. Berg-McGraw was making her uncomfortable. Because of this, she asked Mr. Carr to keep their conversation private so as to ensure she would not be subjected to retaliation.

138.    On October 7, 2022, Coach Crockett met with AD Scott Carr and complained about this discriminatory treatment, indicating she felt it was based on her gender, race, or some combination of the two, citing some of the above examples.

34

139.    AD Carr scheduled a meeting with Coach Crockett and Ms. Berg-McGraw. During the meeting, Ms. Berg-McGraw simply dismissed Plaintiff's concerns, saying things like "I didn't mean that in that way... I would never do that..." etc.

140.    On May 11, 2023, Coach Crockett's supervisor, Ms. Berg-McGraw, told Coach Crockett year-end student surveys had been completed, and that there were some "bad surveys in there."

141.    Coach Crockett was then called in and fired from her position on June 27, 2023.

142.    Defendant does not permit coaches to see the actual surveys but through conversations with administration Plaintiff believes the negative claims about her were generally as follows:

a) Creates a "toxic" environment,

b) Belittles athletes,

c) She is not prepared,

d) "Always late,"

e) "Very negative,"

f) Has communication issues,

g) Plays favorites, and

h) "Yells all the time."

143.    Positive comments included were generally as follows:

a) She really loves us,

b) Takes good care of us,

c) Helps us when we need something,

d) Can "go to her any time,"

e) Makes sure we are fed well, and

f) "She is very knowledgeable."

144. Coach Crockett is concerned about how she went from years of strong coaching to complaints from athletes labeling her as "toxic."

145. Many other coaches at Defendant received negative student athlete surveys and shared concerns regarding the usefulness of these surveys altogether.

146. Plaintiff knows of no other coach who was fired due to negative student athlete surveys, dispute knowing many coaches who received negative complaints.

147. During her time with Defendant, she coached no differently or any more aggressively than any male coach.

148. Coach Crockett engaged in no words or behavior that would justify her termination but for her being a female, African American, and someone who complained about discriminatory treatment by her supervisor.

149. Once again, Florida International University was fully aware that the student complaints were based on "feelings," "relationships," and "likability," not coaching knowledge or program successes. These are hallmarks of stereotyped expectations of women in coaching and cannot form the basis for a decision to discipline or terminate a female coach.

150. While Defendant allowed Plaintiff the opportunity to dispute these claims, it made no difference. Defendant did not compare the action Coach Crockett was being accused of to the action taken or not taken by male or white coaches.

151. Defendant attempted to get the student athletes to complain about Coach Crockett on a Zoom call. Some of the students logged off due to being uncomfortable. Yet complaints by the students were the ultimate reason for Coach Crockett's termination.

152.     In contrast, a women's basketball coach who was accused of having sexual relations with a student athlete was able to keep his job.

153.     Men and white coaches are treated more favorably at Defendant.

**Male Comparators Treated More Favorably**

154.     Florida International University participates in the nationwide practice of illegal segregation and limitation on the hiring and retention of female coaches.  The effects of illegal segregation created and continue the stereotyped expectations of women acting in the role of head coach.

155.     Segregation creates a system where every male coach at Florida International University is a comparator to Coach Crockett. Male coaches are permitted to coach men and women and are permitted to use the entire range of coaching methods without fear of reprisal, including traditionally "masculine" traits – firm, direct, authoritarian.  Notably, these traits are not focused on feelings, relationships, or likeability.

156.     Segregation creates a system where male coaches of men's teams get fewer complaints for engaging in the same or more aggressive (masculine) coaching methods compared to a female coach.  Male coaches of women's teams also get fewer complaints for engaging in the same or more aggressive coaching methods compared to female coaches.  Male coaches of both men's and women's teams get more leeway from administration to engage in a range of coaching methods similar to or more aggressive than the methods used by female coaches. Male coaches of both men's and women's teams receive more administrative support when they receive criticism from athletes, parents, or donors.

157.     Every male coach at Florida International University represents a valid comparator to Coach Crockett, as they either: (i) coach similarly without complaints or termination; (ii) coach

more aggressively without consequences; or (iii) receive administrative support rather than scrutiny when complaints arise.

158. Mike MacIntyre (Head Football Coach 2022-2024) demonstrated confrontational approaches that were treated differently than if exhibited by a female coach. During Coach Crockett's tenure, Coach MacIntyre was publicly accused by former player Reggie Peterson of verbal abuse and physically throwing chairs in the locker room that struck players. He was also accused of throwing players' helmets at practice and making them retrieve them. Despite these serious allegations—far exceeding any conduct alleged against Coach Crockett—Coach MacIntyre faced no disciplinary action for his conduct. He was terminated only for his won-loss record, and even then was afforded three full seasons of poor performance before any action was taken.

159. Jeremy Ballard (Head Men's Basketball Coach) commonly uses direct communication styles and demanding performance expectations. Despite five consecutive losing seasons (2019-20 through 2023-24), Coach Ballard has been retained and supported by the administration. His coaching methods—which include demanding accountability, direct criticism of performance, and high expectations—are characterized as building "a culture of winning" rather than creating a toxic environment. When Coach Crockett employed identical methods, they were characterized as inappropriate.

160. This differential treatment based on coach gender constitutes direct evidence of gender discrimination. Complaints against male coaches are addressed with the presumption of appropriate methodology and administrative support, while complaints against Coach Crockett were presumed valid and resulted in immediate suspension, investigation, and termination without adequate opportunity to respond.

161.    Alternatively, Coach Crockett can establish discrimination through evidence other than comparators, including: (a) statistical evidence of FIU's failure to hire or retain female coaches; (b) direct evidence of discriminatory statements or attitudes by decision-makers; (c) the implausibility of Defendant's proffered reasons for termination given Coach Crockett's exceptional qualifications and performance; and (d) evidence that Defendant deviated from its standard procedures in responding to complaints about Coach Crockett. *See Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1247 (11th Cir. 2015).

162.    The male coaches were permitted to keep coaching without interference, even when there was knowledge that they were engaging in clearly unprofessional and potentially harmful coaching methods.

163.    Plaintiff also identifies a female coaching comparator who was pushed out through the same complaint-driven mechanism that was used against Coach Crockett. Specifically, FIU's women's softball head coach, Chris Steiner-Wilcoxson, was subjected to negative student-athlete feedback and/or athlete complaints that were credited and operationalized in a manner similar to the process used against Coach Crockett—i.e., complaints and survey narratives were treated as a basis to force out a female head coach in circumstances where the underlying criticisms were influenced by gendered expectations about how a woman "should" lead, communicate, and coach, particularly as compared to male coaches who are given greater leeway and administrative support when complaints arise.

164.    As a result of the effects of segregation, the operation of stereotypes, and other actions in violation of state and federal law, Plaintiff has suffered damages in the form of emotional distress and lost income, including long-term damage to her career.

165. Since she was terminated, Coach Crockett has made efforts to get jobs in coaching at the college level, but the manner of her termination has placed a scarlet letter on her resume that causes other universities to avoid hiring her. Coach Crockett's college coaching career is severely damaged and requires strong equitable relief to remedy that long-term damage.

**White Comparators Treated More Favorably**

166. Florida International University knowingly treated Coach Crockett, an African American, less favorably than her white counterparts.

167. Coach Crockett, an Olympian who had been coaching at Defendant for a decade in 2021, was making under $70,000 while coaching Beach Volleyball, Indoor Volleyball, and serving as Assistant AD.

168. In contrast, the head coach hired to take over the Indoor Volleyball program in 2021 was afforded a starting salary of $90,000. That head coach was a white female.

169. That coach was also permitted to hire her husband to be her Assistant Coach. Plaintiff, on the other hand, had to fight for years to be permitted to hire her daughter into a paid Assistant Coach position. When she was finally permitted to do so, her daughter could only serve as "Second Assistant Coach," even though she was more qualified than the First Assistant Coach.[6]

170. As noted herein, Ms. Berg-McGraw also pushed Plaintiff out of her office, banishing her to a trailer away from the other coaches, and denied Plaintiff access to busses while approving buses for white male coaches.

---

[6] Defendant also allowed a white male football coach to hire his two sons as coaching staff while simultaneously denying Plaintiff the opportunity to hire her daughter as a coach.

171. Further, Ms. Berg-McGraw's instruction to Coach Crockett to not recruit Americans because she did not "connect with them" is an offensive directive only made to Coach Crockett as an African American female.

172. Plaintiff further identifies an additional race-based comparator within FIU's coaching ranks. Sharolta Nonen, the African-American head women's soccer coach, was supervised by Julie Berg-McGraw and, according to Plaintiff, was mistreated and ultimately pushed out in circumstances reflecting less favorable treatment of a Black female head coach.

173. On information and belief, Nonen was negatively impacted by student-athlete surveys and/or complaint narratives, and any purported performance-based rationale was influenced by bias tied to her race and/or her status as a female head coach—bias that did not similarly burden white coaches and that was accepted or amplified by FIU decisionmakers.

### FIRST CAUSE OF ACTION
**Violation of Title VII, 42 U.S.C. § 2000e-2(a)(1)**
**(Gender Discrimination – Disparate Treatment)**

174. Plaintiff incorporates by reference paragraphs 1-109, and 128-165 as specifically relevant to this cause of action.

175. Coach Crockett has satisfied all administrative requirements and conditions precedent for bringing suit under Title VII on this claim.

176. Under 42 U.S.C. § 2000e-2(a)(1), it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's... sex."

177. At all times, Defendant was an "employer" within the meaning of Title VII.

178.     Coach Crockett is female and is therefore a member of a protected class under Title VII.

179.     Coach Crockett suffered adverse employment actions, including termination from her position as Head Women's Beach Volleyball Coach.

180.     Coach Crockett was qualified for her position. She is an Olympic medalist, was named National Coach of the Year, and led her team to unprecedented success during her tenure.

181.     Defendant treated similarly situated male coaches more favorably than Coach Crockett. Specifically: (a) Male coaches at FIU who received student-athlete complaints were not subjected to the same heightened scrutiny as Coach Crockett; (b) Male coaches at FIU were not held to the same elevated performance standards as Coach Crockett; (c) Male coaches at FIU were not terminated under circumstances similar to Coach Crockett's.

182.     Defendant's conduct against Coach Crockett constitutes disparate treatment discrimination because Defendant: (a) failed to treat her equally to similarly situated male coaches; (b) subjected her to different and heightened scrutiny at work compared to male coaches; and (c) held her to different and higher performance standards than male coaches.

183.     Defendant discriminated against Coach Crockett on the basis of gender in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), by holding her to a different standard than similarly situated male coaches at FIU in the terms and conditions of her employment, including ultimately terminating her from her position while retaining male coaches who received similar or worse complaints.

184.     Defendant required Coach Crockett to operate within a segregated employment system where female coaches are limited to coaching only women's teams. This limitation

deprived Coach Crockett of opportunities available to male coaches, who are free to coach either men's or women's teams.

185.     Defendant's failure to act on its knowledge of gender stereotyping risks, combined with its active maintenance of a discriminatory system, demonstrates intentional discrimination against Coach Crockett.

186.     On information and belief, in so violating Title VII, Defendant acted in reckless disregard of Coach Crockett's rights under Title VII.

187.     As a result of Defendant's conduct, Coach Crockett suffered loss of employment, loss of wages and benefits, emotional pain and suffering, humiliation, embarrassment, inconvenience, damage to her reputation, loss of career, and out-of-pocket expenses.

188.     The actions of Defendant also require the imposition of specific equitable and injunctive relief necessary to enforce the mandates of Title VII.

## SECOND CAUSE OF ACTION
### Violation of Title VII, 42 U.S.C. § 2000e-2(a)(1)
### (Gender Discrimination – Pay Discrimination)

189.     Plaintiff incorporates by reference paragraphs 1-109, and 128-165 as specifically relevant to this cause of action.

190.     Coach Crockett has satisfied all administrative requirements and conditions precedent for bringing suit under Title VII on this claim.

191.     Under 42 U.S.C. § 2000e-2(a)(1), it is unlawful for an employer to discriminate against any individual "with respect to his compensation . . . because of such individual's . . . sex."

192.     At all times relevant hereto, Defendant was an "employer" within the meaning of Title VII.

43

193. Defendant discriminated against Coach Crockett in her compensation based on her sex by: (a) Requiring Coach Crockett, as a female coach, to perform substantially more work than male coaches for equal or lesser pay; (b) Requiring Coach Crockett to navigate gender-stereotyped expectations, including managing heightened emotional expectations from female student-athletes and walking the line between "feminine" and "masculine" coaching styles, which constitutes additional uncompensated labor not required of male coaches; (c) Failing to compensate Coach Crockett equally to male coaches with similar experience, qualifications, and responsibilities.

194. The additional work required of female coaches, including Coach Crockett, is a direct result of Defendant's maintenance of a gender-segregated coaching system and Defendant's reliance on gender stereotypes in evaluating coaches.

195. On information and belief, male coaches at FIU with comparable responsibilities received higher compensation and/or were not required to perform the same level of additional gender-based emotional labor.

196. As a result of Defendant's pay discrimination, Coach Crockett suffered monetary damages including but not limited to lost wages and benefits.

**THIRD CAUSE OF ACTION**
**Violation of Title VII, 42 U.S.C. § 2000e-2(a)(1)**
**(Gender Discrimination – Hostile Work Environment)**

197. Plaintiff incorporates by reference paragraphs 1-109, and 128-165 as specifically relevant to this cause of action.

198. Coach Crockett has satisfied all administrative requirements and conditions precedent for bringing suit under Title VII on this claim.

199.    Under Title VII, an employer violates the statute when the workplace is permeated with discriminatory conduct that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.

200.    At all times relevant hereto, Defendant was an "employer" within the meaning of Title VII.

201.    Coach Crockett was subjected to a hostile work environment based on her sex, including: (a) Being held to different and higher standards than male coaches; (b) Being subjected to heightened scrutiny and micromanagement not applied to male coaches; (c) Being displaced from her office to accommodate a male coach; (d) Being told not to recruit American players because she did not "connect with them"; (e) Being skipped over when announcing coaches at events; (f) Receiving unjustifiably low evaluation scores; (g) Being subjected to student-athlete complaints driven by gender stereotypes, which Defendant credited without appropriate skepticism; (h) Being required to operate within a segregated system that perpetuates gender stereotypes.

202.    The discriminatory conduct was based on Coach Crockett's sex, as evidenced by the differential treatment she received compared to male coaches.

203.    The discriminatory conduct was sufficiently severe and pervasive to alter the conditions of Coach Crockett's employment and create an abusive working environment.

204.    Defendant knew or should have known that its failure to address gender stereotyping in student-athlete evaluations and its maintenance of a sex-segregated coaching system created a hostile work environment for female coaches, including Coach Crockett, yet failed to take prompt remedial action.

205. As a result of the hostile work environment, Coach Crockett suffered damages including emotional distress, anxiety, humiliation, and damage to her professional reputation.

## FOURTH CAUSE OF ACTION
### Violation of Title VII, 42 U.S.C. § 2000e-2(a)(1)
### (Race Discrimination – Disparate Treatment)

206. Plaintiff re-alleges paragraphs 1-9, 28-153, and 166-173 as if fully stated herein.

207. Coach Crockett has satisfied all administrative requirements and conditions precedent for bringing suit under Title VII on this claim.

208. Under 42 U.S.C. § 2000e-2(a)(1), it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's… race."

209. At all times, Defendant was an "employer" within the meaning of Title VII.

210. Coach Crockett is African American and is therefore a member of a protected class under Title VII.

211. Coach Crockett suffered adverse employment actions, including termination from her position as Head Women's Beach Volleyball Coach.

212. Coach Crockett was qualified for her position. She is an Olympic medalist, was named National Coach of the Year, and led her team to unprecedented success during her tenure.

213. Defendant treated similarly situated white coaches more favorably than Coach Crockett in the terms and conditions of employment, including but not limited to scrutiny, support, and employment decisions.

214. Defendant's conduct against Coach Crockett constitutes disparate treatment discrimination because Defendant failed to treat her equally to similarly situated white coaches,

subjected her to different and heightened scrutiny at work compared to white coaches, and held her to different and higher standards.

215.    Defendant discriminated against Coach Crockett on the basis of race in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), by holding her to a different standard than similarly situated white coaches at FIU in the terms and conditions of her employment, including ultimately terminating her from her position while retaining white coaches who received similar or worse complaints or who were otherwise treated more favorably.

216.    On information and belief, in so violating Title VII, Defendant acted in reckless disregard of Coach Crockett's rights under Title VII.

217.    As a result of Defendant's conduct, Coach Crockett suffered loss of employment, loss of wages and benefits, emotional pain and suffering, humiliation, embarrassment, inconvenience, damage to her reputation, loss of career, and out-of-pocket expenses.

218.    The actions of Defendant also require the imposition of specific equitable and injunctive relief necessary to enforce the mandates of Title VII, including reinstatement, front pay, training, oversight of the athletic department and Florida International University generally to ensure racial equity throughout the University, and any other equitable relief deemed appropriate by the Court.

## FIFTH CAUSE OF ACTION
### Violation of Title VII, 42 U.S.C. § 2000e-2(a)(1)
### (Race Discrimination – Pay Discrimination)

219.    Plaintiff incorporates by reference paragraphs 1-9, 128-153, and 166-173 as specifically relevant to this cause of action.

220.    Coach Crockett has satisfied all administrative requirements and conditions precedent for bringing suit under Title VII on this claim.

221.     Under 42 U.S.C. § 2000e-2(a)(1), it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation . . . because of such individual's . . . sex."

222.     At all times relevant hereto, Defendant was an "employer" within the meaning of Title VII.

223.     Defendant discriminated against Coach Crockett in her compensation based on her race by, among other things: (a) paying Coach Crockett less than similarly situated white coaches with comparable experience, qualifications, and responsibilities; (b) failing to compensate Coach Crockett equitably for the scope of her duties and leadership responsibilities compared to white coaches; and/or (c) otherwise maintaining compensation practices that resulted in Coach Crockett receiving lower compensation because of race.

224.     On information and belief, in so violating Title VII, Defendant acted with intentional discrimination and/or reckless disregard of Coach Crockett's rights under Title VII.

225.     As a result of Defendant's conduct, Coach Crockett suffered loss of wages and benefits, emotional pain and suffering, humiliation, embarrassment, damage to her reputation, loss of career, and out-of-pocket expenses.

226.     The actions of Defendant require the imposition of equitable and injunctive relief necessary to enforce the mandates of Title VII.

**SIXTH CAUSE OF ACTION**
**Violation of Title VII, 42 U.S.C. § 2000e-2(a)(1)**
**(Race Discrimination – Hostile Work Environment)**

227.     Plaintiff incorporates by reference paragraphs 1-9, 28-153, and 166-173 as specifically relevant to this cause of action.

228. Coach Crockett has satisfied all administrative requirements and conditions precedent for bringing suit under Title VII on this claim.

229. Under 42 U.S.C. § 2000e-2(a)(1), it is unlawful for an employer to discriminate against any individual "with respect to his compensation . . . because of such individual's . . . race."

230. At all times relevant hereto, Defendant was an "employer" within the meaning of Title VII.

231. Coach Crockett is African American and is therefore a member of a protected class under Title VII.

232. Defendant subjected Coach Crockett to unwelcome harassment and discriminatory conduct in the workplace.

233. Coach Crockett was subjected to a hostile work environment based on her race, including: (a) Being held to different and higher standards than white coaches; (b) Being subjected to heightened scrutiny and micromanagement not applied to white coaches; (c) Being displaced from her office to accommodate a white coach; (d) Being told not to recruit American players because she did not "connect with them"; (e) Being skipped over when announcing coaches at events; (f) Receiving unjustifiably low evaluation scores; (g) Being subjected to student-athlete complaints driven by gender stereotypes, which Defendant credited without appropriate skepticism; (h) Being required to operate within a segregated system that perpetuates gender stereotypes.

234. The discriminatory conduct was sufficiently severe and pervasive to alter the conditions of Coach Crockett's employment and create an abusive working environment.

235.     Defendant knew or should have known that Coach Crockett was being subjected to race-based discriminatory treatment affecting the terms and conditions of her employment, yet failed to take prompt remedial action.

236.     On information and belief, in so violating Title VII, Defendant acted with intentional discrimination and/or reckless disregard of Coach Crockett's rights under Title VII.

237.     As a result of the hostile work environment, Coach Crockett suffered damages including emotional distress, anxiety, humiliation, and damage to her professional reputation.

238.     The actions of Defendant require the imposition of equitable and injunctive relief necessary to enforce the mandates of Title VII.

## SEVENTH CAUSE OF ACTION
### Violation of Title VII, 42 U.S.C. § 2000e-3
### (Retaliation)

239.     Plaintiff incorporates by reference paragraphs 1-9, 28-153, and 166-173 as specifically relevant to this cause of action.

240.     Coach Crockett has satisfied all administrative requirements and conditions precedent for bringing suit under Title VII on this claim.

241.     Under the provisions of Title VII, it is unlawful for an employer to retaliate against an employee for making protected complaints under Title VII.

242.     At all times, Defendant was an "employer" within the meaning of Title VII.

243.     Plaintiff's supervisor treated her less favorably than male and white coaches.

244.     Specifically, Plaintiff's supervisor micromanaged Plaintiff; displaced Plaintiff from her office to give it to a white coach; told Plaintiff not to recruit American players because she did not "connect with them;" skipped over Plaintiff when announcing coaches at events;

50

gave Plaintiff low evaluation scores that could not be justified; hired a white, less-experienced Indoor Volleyball coach over Plaintiff's African American daughter, an FIU grad who had been coaching for years; would not approve Plaintiff's requests for busses while approving them for white male coaches; posed questions to players insinuating they should talk badly of Plaintiff.

245.    Plaintiff complained about this treatment by her supervisor to AD Scott Carr, indicating she felt it was based on her gender and/or race.

246.    Following these protected complaints, Defendant fired Plaintiff.

247.    Defendant jumped on the opportunity to rely on biased student-athlete complaints in an attempt to justify Plaintiff's termination after she complained about discrimination. In particular, close in time to Plaintiff's first complaint in October 2023, Athletic Director Carr called a meeting with Plaintiff and the subject of Plaintiff's complaints, Ms. Berg-McGraw, where Ms. Berg-McGraw was directly informed of Plaintiff's complaints. During that same meeting, Ms. Berg-McGraw attempted to fault Plaintiff by resurrecting prior negative athlete feedback that, before Plaintiff complained of discrimination, had never been used against her. With no legitimate basis to terminate Plaintiff at that time, Defendant waited for a pretextual opportunity, later seizing on new negative survey results as supposed justification for the termination.

248.    As a proximate result of Defendant's actions, Plaintiff has in the past and will in the future suffer injuries and damages as set forth above.

249.    Defendant acted with deliberate indifference and willful and wanton disregard to Coach Crockett's federally protected rights.

250. As a result of Defendant's actions, Coach Crockett seeks monetary damages including, but not limited to, economic damages, career loss, and damages for indignity and humiliation.

## EIGHTH CAUSE OF ACTION
### Violation of Title IX, 20 U.S.C. § 1681
### (Retaliation)

251. Plaintiff incorporates by reference paragraphs 1-9, 67-81, and 119-153 as specifically relevant to this cause of action.

252. Unlike employment discrimination claims, Title IX expressly provides a cause of action for retaliation. The Supreme Court in *Jackson v. Birmingham Board of Education,* 544 U.S. 167, 173 (2005), held that "retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination . . ."

253. Coach Crockett's protected activity under Title IX included complaints about discrimination affecting the educational program and opportunities available to student-athletes. Specifically, Coach Crockett complained about: (a) the discriminatory conditions under which female coaches are required to operate, which directly affects the quality of coaching available to female student-athletes; (b) the differential treatment of female student-athletes' complaints compared to male student-athletes' complaints; (c) the systemic disadvantages faced by female athletic programs due to gender stereotyping; and (d) the differential provision of transportation services for women's teams when compared to men's teams.

254. Coach Crockett's complaints implicated the educational opportunities of female student-athletes, not merely her own employment conditions. As the Supreme Court recognized in *Jackson*, "teachers and coaches . . . are often in the best position to vindicate the rights of their

52

students because they are better able to identify discrimination and bring it to the attention of administrators." 544 U.S. at 181. Coach Crockett acted in precisely this capacity.

255. The Eleventh Circuit's decision in *Joseph v. Board of Regents,* 121 F.4th 855 (11th Cir. 2024), addressed only Title IX's implied right of action for employment discrimination, not retaliation. *Joseph* did not disturb *Jackson*'s holding that Title IX prohibits retaliation, and this Court should permit Coach Crockett's Title IX retaliation claim to proceed.

256. As a result of Defendant's actions, Coach Crockett seeks monetary damages including, but not limited to, economic damages, career loss, and damages for indignity and humiliation.

**NINTH CAUSE OF ACTION**
**Violation of Title VII, 42 U.S.C. § 2000e-2(a)(2)**
**(Segregation or Limitation)**

257. Plaintiff incorporates by reference paragraphs 1-66, 42-53, and 128-165 as specifically relevant to this cause of action.

258. Coach Crockett has satisfied all administrative requirements and conditions precedent for bringing suit under Title VII on this claim.

259. 42 U.S.C. § 2000e-2(a)(2) makes it unlawful for an employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex."

260. This provision creates an individual right of action available to any employee who has been subjected to unlawful classification, segregation, or limitation. This claim is distinct from the government's authority to bring pattern-or-practice claims under 42 U.S.C.

53

§ 2000e-6. To be clear, Plaintiff does not assert a pattern-or-practice claim under 42 U.S.C. § 2000e-6

261.    At all times relevant hereto, Defendant was an "employer" within the meaning of Title VII.

262.    Defendant has limited, segregated, and classified female coaches, including Plaintiff, by: (a) Maintaining a hiring and assignment practice under which no woman has been hired to coach a men's athletic team at FIU; (b) Channeling women exclusively into coaching positions for women's teams; (c) Thereby depriving Plaintiff and other female coaches of employment opportunities available to male coaches, who may coach either men's or women's teams.

263.    According to EADA data, FIU employs zero women as head or assistant coaches for men's teams, while employing multiple male coaches for women's teams. This asymmetry demonstrates intentional classification of coaching positions by sex.

264.    Coach Crockett did not apply to coach men's teams because Defendant's well-established practice of excluding women from such positions made any such application futile. Under the futile gesture doctrine, Plaintiff was not required to engage in the futility of applying for positions that Defendant has never filled with female candidates. *See Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 365-66 (1977).

265.    Coach Crockett has been personally deprived of employment opportunities as a result of Defendant's classification and limitation practice: (a) Her employment opportunities at FIU were limited to coaching women's teams only; (b) She was required to work within a segregated system that imposed additional burdens on female coaches not borne by male

coaches; (c) This segregation and classification contributed to her termination by subjecting her to gender-stereotyped evaluations and heightened scrutiny that male coaches do not face.

266. On information and belief, Defendant has intentionally maintained its practice of limiting women to women's coaching positions.

267. Defendant's classification and limitation of female coaches to women's teams only constitutes a *per se* violation of 42 U.S.C. § 2000e-2(a)(2), as such classification deprives female employees of employment opportunities because of their sex.

268. As a proximate cause of Defendant's violations of 42 U.S.C. § 2000e-2(a)(2), Plaintiff has suffered damages including: loss of employment opportunities; loss of wages and benefits; emotional distress; damage to professional reputation; career harm; and the stigmatic injury of being classified as suitable only to coach women.

269. The actions of Defendant require the imposition of equitable and injunctive relief necessary to enforce the mandates of Title VII, including an order requiring Defendant to cease its practice of limiting and segregating female coaches.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Rita Crockett respectfully requests that this Honorable Court enter judgment in her favor and against Defendant Florida International University Board of Trustees as follows:

A. Declare that the actions of Defendant violated Plaintiff's rights under Title VII and Title IX;

B. Award Plaintiff compensatory damages in an amount to be determined at trial, including but not limited to back pay, front pay, lost benefits, and compensation for emotional distress, humiliation, and damage to reputation;

55

C.  Award Plaintiff punitive damages to the extent permitted by law;

D.  Award Plaintiff reasonable attorneys' fees and costs of this action pursuant to 42 U.S.C. § 2000e-5(k);

E.  Order equitable and injunctive relief as necessary to make Plaintiff whole and prevent future violations, including an order requiring Defendant to cease its practice of limiting and segregating female coaches;

F.  Award pre-judgment and post-judgment interest at the maximum rate allowed by law; and

G.  Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

Sharp Law Firm, P.A. (Local Counsel)

*/s/ Christopher C. Sharp*
Christopher C. Sharp, Esq.
Board Certified in Labor and Employment Law
1600 West State Road 84, Suite C
Fort Lauderdale, Florida 33315
Phone:  (954) 909-4246
Fax:  (954) 827-8028
Email: chris@csharplawfirm.com

Newkirk Zwagerman, P.L.C.

*/s/ Thomas Newkirk*
Thomas Newkirk
IA Bar No. AT0005791
tnewkirk@newkirklaw.com
Myles D. Young
IA Bar No. AT0015901
myoung@newkirklaw.com

56

3900 Ingersoll Ave, Suite 201
Des Moines, IA  50312
Tel: (515) 883-2000
Fax: (515) 883-2000
*Pro Hac Vice Forthcoming*

ATTORNEYS FOR PLAINTIFF

**Certificate of Service**

I hereby certify that on February 4, 2026, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF..

By:   *Christopher C. Sharp*
        Christopher C. Sharp, Esq.

**SERVICE LIST
Case No. 25-cv-20763**

Christopher C. Sharp, Esq.
Email: csharplaw@aol.com
SHARP LAW FIRM, P.A.
1600 West State Road 84, Suite C
Fort Lauderdale, FL 33315
Local Counsel for Plaintiff

Thomas Newkirk, Esq.
Email:  tnewkirk@newkirklaw.com
Myles Young, Esq.
Email : myoung@newkirklaw.com
NEWKIRK ZWAGERMAN, P.L.C.
3900 Ingersoll Ave, Suite 201
Des Moines, IA  50312
Counsel for Plaintiff (*Pro Hac Vice*)

Lourdes Espino Wydler, Esq.
Email: lew@wydlerlaw.com
Lauren D. Martin, Esq.
Email: ldm@wydlerlaw.com
WYDLER LAW
2600 Douglas Road, PH-4
Coral Gables, FL 33134
Attorneys for Defendant, FIU Board of Trustees